```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/19/19
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------X

ANNETTE MARTINEZ,                         :

                        Plaintiff,        :        17 Civ. 8949 (HBP)

    -against-                             :        OPINION
                                                   AND ORDER
COMMISSIONER OF SOCIAL SECURITY,          :

                        Defendant.        :

-----------------------------------X

PITMAN, United States Magistrate Judge:


I.  Introduction


        Plaintiff Annette Martinez brings this action pursuant
to Section 205(g) of the Social Security Act (the "Act"), 42
U.S.C. § 405(g), seeking judicial review of a final decision of
the Commissioner of Social Security (the "Commissioner"), denying
her application for disability insurance benefits ("DIB") (Com-
plaint, dated Nov. 10, 2017 (Docket Item ("D.I.") 7) ("Compl.")).
Plaintiff and the Commissioner have both moved for judgment on
the pleadings pursuant to Rule 12(c) of the Federal Rules of
Civil Procedure (D.I. 16, 18).  All parties have consented to my
exercising plenary jurisdiction pursuant to 28 U.S.C. § 636(c).
For the reasons set forth below, the Commissioner's motion is
granted and plaintiff's motion is denied.

II.  Facts[1]

A.  Procedural Background

On August 12, 2013, plaintiff filed an application for
DIB alleging that she became disabled on June 26, 2013 due to a
herniated disc in her lumbar spine, a right wrist injury, post
traumatic stress disorder ("PTSD"), mood disorder and depressive
disorder (Tr. 110-11, 215).  After her application for benefits
was initially denied on May 13, 2014, she requested, and was
granted, a hearing before an administrative law judge ("ALJ")
(Tr. 120, 136-42).

On March 18, 2016, plaintiff and her attorney appeared
before ALJ Robert Gonzalez for a hearing, at which plaintiff and
a vocational expert testified (Tr. 36-103).  On June 29, 2016,
the ALJ issued his decision finding that plaintiff was not
disabled (Tr. 18-30).  This decision became the final decision of
the Commissioner on September 14, 2017 when the Appeals Council
denied plaintiff's request for review (Tr. 1-6).  Plaintiff
timely commenced this action on November 16, 2017, seeking review
of the Commissioner's decision (Compl.).

---

[1]I recite only those facts relevant to the resolution of the
pending motions.  The administrative record that the Commissioner
filed pursuant to 42 U.S.C. § 405(g) (see Notice of Filing of the
Administrative Record, dated Mar. 1, 2018 (D.I. 10) ("Tr.")) more
fully sets out plaintiff's social and medical history.

B.  Social Background

Plaintiff was born on July 9, 1961 and was 52 years old at the time she applied for disability (Tr. 186). Plaintiff is a high school graduate who worked as a deposit operations manager for a bank from 1983 to 2013 (Tr. 216). Plaintiff stated in her "Disability Report," dated February 20, 2014, that this position required her to occasionally walk, stand, climb, stoop, crouch, handle large objects and lift objects up to 20 pounds, and frequently sit, type, handle small objects and lift objects up to ten pounds (Tr. 217). However, at the hearing, plaintiff testified that she would frequently lift boxes weighing up to 50 pounds (Tr. 77). Plaintiff was also responsible for sending bank statements to customers, auditing deposits, conducting research, filing and supervising and training several other employees at the bank (Tr. 67-68, 216-17).

On January 8, 2013, plaintiff slipped on some water inside the break room of her office and fell on her backside, injuring her lower back (Tr. 68-69, 265, 307). Plaintiff was able to get up and eat lunch with other employees, but continued to feel uncomfortable throughout the day (Tr. 307). Plaintiff did not go to the hospital, but visited a doctor at Rockland Orthopedics & Sports Medicine six days later on January 14, 2013 (Tr. 265). Plaintiff was absent from work for approximately two weeks after this accident (Tr. 69-70). Plaintiff returned to

3

work, but eventually left her position on June 26, 2013 because of her increased lower back pain[2] (Tr. 215). Plaintiff filed a workers' compensation claim for this accident and was receiving approximately $3,000 per month in workers' compensation as of March 18, 2016 (Tr. 41).

Plaintiff lives in a house with her husband and two adult children (Tr. 62). Plaintiff testified at the hearing that she stays home all day because she is depressed and claimed that she still has traumatic "flashbacks" about her workplace accident (Tr. 82-83). She further testified that she goes shopping approximately once a week, but is unable to go alone (Tr. 83-84). She does not take public transportation, but drives herself to her doctors' appointments approximately four times per week (Tr. 84). In her "Function Report," dated March 24, 2014, plaintiff stated that she required her daughter's help to dress and bathe herself and was unable to do any household chores because of her persistent lower back pain (Tr. 225-26). She further stated that she had no hobbies and had "no interest in doing anything whatso-ever" because she was depressed about her condition (Tr. 229). Plaintiff also claimed that she was unable to lift any objects, squat, kneel or reach, and was unable to sit or stand for long periods of time (Tr. 230-32).

---

[2]There is a discrepancy in the record as to whether plaintiff voluntarily left her position or whether she was terminated after her bank merged with another bank (Tr. 23).

4

Plaintiff traveled to Puerto Rico in the summer of 2014 for five days (Tr. 66). She traveled to the Dominican Republic twice in 2015 -- in April 2015 for ten days and then a few months later for seven days (Tr. 63-64). She also traveled to Florida for five days in May 2015 and again for six days in February 2016, two weeks prior to her hearing (Tr. 63-64).

C.  Medical Background

   1.  Medical Records Pre-Dating
       the Relevant Time Period

      a.  Rockland Orthopedics
          & Sport Medicine

Plaintiff visited Rockland Orthopedics & Sport Medicine ("ROSM") on January 14, 2013 complaining of right hip and pelvis pain following her fall on January 8, 2013 (Tr. 265). Plaintiff was examined by Dr. Michael Robinson who noted that plaintiff was limping on her right side and presented with antalgic gait[3] (Tr. 267). Plaintiff's straight-leg-raising tests[4] were negative

_____

[3]Antalgic gait refers to a manner of walking in which a limp is adopted in order to avoid pain on weight bearing structures. See Dorland's Illustrated Medical Dictionary, 753 (32nd ed. 2012) ("Dorland's")

[4]The straight-leg-raising test is used to assess patients who complain of back pain that radiates down one leg for nerve root irritation. To conduct a straight-leg-raising test, the patient must first lie on his or her back and completely relax the affected leg. Cupping the heel of the foot of that leg, the
(continued...)

bilaterally and her physical examination was normal (Tr. 266-67). Plaintiff's sensations and reflexes were normal, but she exhibited some pain when her right hip was rotated (Tr. 267). Dr. Robinson expressed concern that plaintiff might have fractured her pelvis and ordered an X-ray (Tr. 269). Dr. Robinson opined that plaintiff was 50% impaired (Tr. 269).

Plaintiff underwent this MRI the following day, which revealed no evidence of a fracture and no abnormalities (Tr. 273). Plaintiff was examined by Dr. Steven A. Renzoni who noted that plaintiff's physical and neurological examinations were normal and her straight-leg-raising tests were negative bilaterally (Tr. 272-73). However, plaintiff reported significant pain in her pelvis and hip region (Tr. 272-73). Dr. Renzoni opined that plaintiff would be totally disabled for the next two weeks (Tr. 273).

Plaintiff visited Dr. Renzoni at ROSM again on January 28, 2013 and reported feeling much better (Tr. 275). Plaintiff's straight-leg-raising tests were negative bilaterally and her

---

[4](...continued)
examiner will gently raise the leg. If the patient experiences pain when his or her leg is elevated between 30 and 60 degrees, the test is positive, indicating that nerve root irritation is likely; if there is no sensitivity in that range, the test is negative and the patient is unlikely to be suffering from nerve root irritation. A Practical Guide to Clinical Medicine: Musculo-Skeletal Examination, University of California, San Diego School of Medicine, available at https://meded.ucsd.edu/clincalmed/joints6.htm (last visited Mar. 12, 2019).

reflexes were normal (Tr. 277-78). Plaintiff exhibited some

tenderness in her buttocks and presented with antalgic gait (Tr.

277-78). Dr. Renzoni diagnosed plaintiff with a lumbar sprain[5]

and recommended physical therapy (Tr. 278). Dr. Renzoni opined

that plaintiff could return to work without restriction (Tr.

279).

On February 6, 2013, Dr. Renzoni filled out a physical

therapy evaluation for plaintiff and noted that plaintiff had

been experiencing lower back and buttocks pain that radiated to

her legs (Tr. 292). Plaintiff reported that the pain was

exacerbated by prolonged standing, sitting and squatting (Tr.

292). Dr. Renzoni noted that plaintiff exhibited a normal range

of motion in her lumbar spine,[6] but reported some pain with

rotation (Tr. 294). Dr. Renzoni further noted that plaintiff's

straight-leg-raising tests were negative bilaterally and that she

exhibited full muscle strength in her legs (Tr. 294). Dr.

Renzoni opined that plaintiff could only stand, sit or walk for

---

[5]A lumbar sprain is caused when ligaments are torn from
their attachments in the lower back. A lumbar sprain is commonly
treated with rest, pain medication or physical therapy. Low Back
Strain and Sprain, American Association of Neurological Surgeons,
available at https://www.aans.org/patients/neurosurgical-
conditions-and-treatments/low-back-strain-and-sprain (last
visited Mar. 12, 2019).

[6]The lumbar region of the spine is located below the
thoracic region and is made up of vertebrae L1 through L5.
Anatomy of the Human Spine, Mayfield Brain & Spine, available at
https://www.mayfieldclinic.com/PE-AnatSpine.htm (last visited
Mar. 12, 2019).

ten minutes at a time (Tr. 293).

Plaintiff attended a physical therapy session at ROSM on February 11, 2013 (Tr. 348). The therapist's progress notes indicate that plaintiff experienced pain throughout all of the exercises (Tr. 348). Plaintiff tolerated her exercises much better at her next session on February 21, 2013 (Tr. 361).

Plaintiff returned to ROSM on February 25, 2013 complaining of right lower back pain, but reported she was feeling much better with physical therapy (Tr. 280). Plaintiff presented with normal gait and her reflexes and sensations were all normal (Tr. 280-81). Plaintiff exhibited a full range of motion in her lumbar spine and right hip, and her straight-leg-raising tests were negative bilaterally (Tr. 282). Dr. Renzoni noted some tenderness at plaintiff's right sacroiliac joint[7] and continued to recommend physical therapy (Tr. 282).

Plaintiff attended a physical therapy session at ROSM on February 28, 2013 and reported that her pain level had de-creased (Tr. 365). Plaintiff tolerated the exercises well and exhibited an improved range of motion in her lumbar spine (Tr. 365). Her range of motion and pain continued to improve at her next session on March 5, 2013 (Tr. 366).

---

[7]The sacroiliac joint connects the sacrum (the triangular bone at the bottom of the spine) with the pelvis on each side of the lower spine. Sacroiliac Joint Anatomy, Spine Health, available at https://www.spine-health/conditions/spine-anatomy/sacroiliac-joint-anatomy (last visited Mar. 12, 2019).

Plaintiff visited Dr. Renzoni again on March 18, 2013 and reported continued right lower back pain (Tr. 286). Plaintiff presented with a normal gait and her reflexes and sensations were all normal (Tr. 287). Plaintiff exhibited adequate range of motion in her lumbar spine and her straight-leg-raising tests were negative bilaterally (Tr. 288). Dr. Renzoni noted some tenderness at plaintiff's right sacroiliac joint and continued to recommend physical therapy (Tr. 288).

Plaintiff attended a physical therapy session on March 26, 2013 and exhibited notable improvements in her range of motion and muscle strength, and reported that her pain continued to improve (Tr. 370).

On April 23, 2013, plaintiff reported to Dr. Renzoni that she had stopped going to physical therapy for the past four weeks and that her lower back pain was a five out of ten (Tr. 289). Plaintiff presented with a normal gait and her reflexes and sensations were all normal (Tr. 290). Plaintiff exhibited adequate range of motion in her lumbar spine and her straight-leg-raising tests were negative bilaterally (Tr. 291). Dr. Renzoni noted some tenderness at plaintiff's right sacroiliac joint and continued to recommend physical therapy (Tr. 291).

b.  Dr. Annarose Polifrone

Plaintiff visited Dr. Annarose Polifrone on May 14, 2013 for a pain management evaluation due to the ongoing pain in her lower back (Tr. 319).  Plaintiff reported that the pain radiated from her lower back into right buttocks, leg and foot (Tr. 319).  She further reported weakness in her left leg, numbness in her right toes, difficulty sleeping and that she was unable to sit or stand for more than 15 to 20 minutes at a time (Tr. 319).  Plaintiff informed Dr. Polifrone that physical therapy had not improved her condition and that she was currently taking Flexoril and Vicodin for her pain (Tr. 319).  Plaintiff was working full-time at the time of this appointment (Tr. 320).

Plaintiff presented with a normal gait (Tr. 320).  She exhibited a limited range of motion in her lumbar spine and had a positive straight-leg-raising test on her right side (Tr. 320).  Dr. Polifrone noted decreased sensations at L4-L5, but no muscle atrophy[8] (Tr. 320).  Dr. Polifrone diagnosed plaintiff with left-sided radiculopathy[9] and ordered an MRI of plaintiff's lumbar spine to confirm (Tr. 320).  This MRI took place on May 28, 2013

---

[8]Myopathy is any disease of the muscle.  Dorland's at 1224.

[9]Radiculopathy is any disease of the nerve roots commonly caused by inflammation or impingement of the nerve.  Dorland's at 1571.

10

and revealed that plaintiff had a herniated disc[10] at L4-L5 that was encroaching the left neural foramen, but the exiting nerve root appeared intact (Tr. 324, 425). The MRI also revealed a small herniated disc at L5-S1, but no significant spinal canal stenosis[11] (Tr. 324, 425-26)

Plaintiff visited Dr. Polifrone again on June 25, 2013 and reported lower back pain that radiated into both legs and associated numbness and weakness (Tr. 324). Dr. Polifrone recommended physical therapy and instructed plaintiff to remain home from work until her next appointment (Tr. 324). Dr. Polifrone opined that plaintiff was totally disabled (Tr. 433).

2. Medical Records for
the Relevant Time Period

a. Dr. Annarose Polifrone

Plaintiff visited Dr. Polifrone for a follow-up appointment on July 30, 2013 and reported lower back pain that

---

[10]A herniated disc occurs when a disc becomes compressed and breaks, causing the inner gel from the disc to leak into the spinal cord and impact a nerve root. Lumbar (Lower Back) Herniated Disc - Overview and Treatment Options, Laser Spine Institute, available at https://www.laserspineinstitute.com/herniated_disc/lumbar/ (last visited Mar. 12, 2019).

[11]Spinal stenosis is the narrowing of spaces within the spinal cord, which can put pressure on nerves. See Spinal Stenosis Overview, Mayo Clinic, available at https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961 (last visited Mar. 12, 2019).

radiated into both legs and associated numbness and weakness (Tr. 324). Plaintiff exhibited decreased sensations at L4-L5 and had a positive straight-leg-raising test on her right side (Tr. 325). Dr. Polifrone ordered an electromyogram test ("EMG")[12], which confirmed that plaintiff had S1 radiculopathy on her right side with axonal involvement of the tibial motor nerve[13] (Tr. 324). Dr. Polifrone discussed with plaintiff the treatment options of steroid injections or surgery, but plaintiff opted to continue physical therapy (Tr. 324).

Plaintiff visited Dr. Polifrone again on September 26, 2013 and reported continuing lower back pain and pain in her right wrist that radiated up her right arm (Tr. 329). Dr. Polifrone noted a limited range of motion due to pain and weakness in plaintiff's right wrist (Tr. 329). Dr. Polifrone ordered X-rays of plaintiff's wrist, which revealed no fractures or abnormalities (Tr. 329-30, 336).

Plaintiff visited Dr. Polifrone again on October 9, 2013 and reported continued lower back pain that radiated into both legs and continued pain and weakness in her right wrist (Tr.

---

[12]An electromyogram test is an electrodiagnostic test that records extracellular activity of skeletal muscles while at rest, during voluntary contractions and electrical stimulation. See Dorland's at 602.

[13]The tibial motor nerve branches off from the sciatic nerve and innervates the muscles of the lower leg and foot. Tibial Nerve, Healthline, available at https://www.healthline.com/human-body-maps/tibial-nerve (last visited Mar. 12, 2019).

330). Plaintiff exhibited a limited range of motion in her lumbar spine due to pain, decreased sensations in her lower back and had a positive straight-leg-raising test on her right side (Tr. 330). She also exhibited weakness and a decreased range of motion in her right wrist (Tr. 330). Dr. Polifrone ordered an additional EMG study, which revealed left-sided S1 radiculopathy (Tr. 330).

Plaintiff visited Dr. Polifrone again on November 8, 2013 and reported that her lower back pain had increased with the onset of the cold weather (Tr. 334). Dr. Polifrone noted that plaintiff was walking with a limp and needed assistance getting on and off the examination table (Tr. 334). Dr. Polifrone further noted a muscle spasm at L5-S1 and gave plaintiff a steroid injection for the pain, which plaintiff reported provided significant relief (Tr. 334).

Plaintiff visited Dr. Polifrone again on December 6, 2013 and reported that her lower back and leg pain had improved since her last visit (Tr. 335). The range of motion in plaintiff's lumbar spine also showed improvement (Tr. 335). However, plaintiff reported that she was now experiencing strong symptoms of depression and anxiety due to her physical condition (Tr. 335). Dr. Polifrone referred plaintiff to Dr. Stephen Koretsky for a psychological consultation (Tr. 335).

Plaintiff visited Dr. Polifrone again on January 8,

2014 and reported continued lower back pain that radiated into both legs with associated numbness and weakness (Tr. 322). Plaintiff further reported that she was having difficulty with her daily activities and was able to sit or stand in one position for only approximately 15 minutes (Tr. 322). Dr. Polifrone noted that plaintiff was walking with a limp and needed assistance getting on and off the examination table (Tr. 322). Plaintiff exhibited decreased range of motion in her lumbar spine, decreased sensations in her lower back and weakness in her legs (Tr. 322). Plaintiff's straight-leg-raising tests were positive bilaterally (Tr. 322). Dr. Polifrone recommended continued physical therapy and pain medication (Tr. 322).

Plaintiff visited Dr. Polifrone again on February 6, March 5 and April 4, 2014 and reported that her condition remained unchanged (Tr. 322, 525, 549).

On May 6, 2014, plaintiff reported that her pain had increased and she was having difficulty standing up straight because of her leg pain (Tr. 546). Dr. Polifrone gave plaintiff a steroid injection that significantly helped, and plaintiff reported no pain by the time she left the appointment (Tr. 546). At her next appointment on May 30, 2014, plaintiff reported that her pain had improved (Tr. 552).

Plaintiff visited Dr. Polifrone again on June 27, 2014 and reported severe lower back pain that radiated into her right

leg (Tr. 555). Plaintiff presented with an antalgic gait and exhibited muscle spasms at L5-S1 (Tr. 555). Dr. Polifrone noted that plaintiff appeared to be in mild distress due to her pain and gave plaintiff another injection (Tr. 555). Plaintiff reported that the injection reduced her pain (Tr. 555).

Plaintiff visited Dr. Polifrone again on July 25, 2014 and reported lower back pain (Tr. 558). Plaintiff exhibited a limited range of motion in her lumbar spine and Dr. Polifrone noted that her condition remained substantially unchanged (Tr. 558).

Plaintiff visited Dr. Polifrone again on August 28, 2014 and reported continued lower back pain (Tr. 561). Plaintiff reported that her pain medication was providing her with some relief (Tr. 561). Dr. Polifrone noted that plaintiff was walking with a limp and that she experienced muscle spasms during her lumbar spine rotation (Tr. 561). Plaintiff's straight-leg-raising tests were positive bilaterally and she exhibited de-creased sensations and muscle weakness in her lower back (Tr. 561).

Plaintiff next visited Dr. Polifrone on September 25, 2014 and reported that the pain and weakness in her right wrist was getting worse (Tr. 564). Dr. Polifrone noted that plain-tiff's physical examination remained unchanged (Tr. 564).

Plaintiff visited Dr. Polifrone again on October 24,

2014 and reported that her lower back and right leg pain had increased and that she now had difficulty with sitting for more than a few minutes at a time (Tr. 567). ·Plaintiff presented with an antalgic gait and experienced muscle spasms at L5-S1 during her examination (Tr. 567). Dr. Polifrone gave her a steroid injection, which alleviated some of her pain (Tr. 567). Plaintiff reported that her pain had improved at her next appointment on November 19, 2014 (Tr. 570).

Plaintiff visited Dr. Polifrone again on December 17, 2014 and reported continued lower back and right wrist pain and associated weakness (Tr. 573). Plaintiff's straight-leg-raising tests were positive bilaterally and she exhibited decreased sensations and muscle weakness in her lower back, legs and wrist (Tr. 573).

Plaintiff's symptoms and physical examination results remained unchanged at her appointments on January 29, February 25, March 26, May 27, June 17 and July 24, 2015 (Tr. 576, 581, 584, 587, 590). Dr. Polifrone noted that plaintiff needed a cane to safely walk at her appointment on March 26, 2015 (Tr. 581). Throughout these appointments, Dr. Polifrone continued to recommend a conservative course of treatment consisting of physical therapy, home exercises and pain medication (Tr. 576, 581, 584, 587, 590).

On August 25, 2015, plaintiff reported severe pain in

her lower back that radiated into her right leg (Tr. 593).
Plaintiff presented with an antalgic gait and exhibited muscle
spasms at L5-S1 (Tr. 593). Dr. Polifrone gave plaintiff a
steroid injection, which alleviated her pain (Tr. 593).

Plaintiff visited Dr. Polifrone again on September 18,
2015 and reported neck and lower back pain that radiated into her
arms and legs (Tr. 596). Plaintiff further reported that her
right wrist pain had increased since her last visit (Tr. 596).
Plaintiff used a cane to walk during this appointment (Tr. 596).

Plaintiff next visited Dr. Polifrone on October 9, 2015
and reported continued neck, lower back and right wrist pain (Tr.
596). Plaintiff's straight-leg-raising tests were positive
bilaterally, and she exhibited decreased sensations and limited
range of motion in her cervical spine, lumbar spine and right
wrist (Tr. 596). Dr. Polifrone recommended that plaintiff
consult with an orthopedic surgeon (Tr. 596).

Plaintiff visited Dr. Polifrone again on November 12,
2015 and reported continued neck, lower back and right wrist pain
(Tr. 599). Plaintiff was limping during this appointment and
needed a cane to walk (Tr. 599). Plaintiff's straight-leg-
raising tests were positive bilaterally and she exhibited de-
creased sensations and limited range of motion in her cervical
spine, lumbar spine and right wrist (Tr. 599). Plaintiff's
condition remained unchanged at her next appointment on December

17

10, 2015 (Tr. 602).

The following day, Dr. Anne Miller performed surgery on plaintiff's right wrist (Tr. 685). During surgery, Dr. Miller noted that there was a marked deformity on plaintiff's pisiform bone[14] with a proximal osteophyte[15] (Tr. 685). Dr. Miller further noted that there was a loose body within the joint which was removed (Tr. 685).

Plaintiff visited Dr. Polifrone again on January 15, 2016 and reported that her right wrist pain had improved since the surgery, but she still exhibited muscle weakness and a limited range of motion during her physical examination (Tr. 605). Plaintiff's straight-leg-raising tests were positive bilaterally and she exhibited decreased sensations and limited range of motion in her cervical and lumbar spine (Tr. 605). Plaintiff's condition remained unchanged at her next appointment on February 12, 2016 (Tr. 608).

Throughout plaintiff's treatment period, Dr. Polifrone filled out several workers' compensation forms and opined that

---

[14]The pisiform bone is one of eight small bones in the wrist and is the "ball shaped" bone located on the pinky-side of the wrist. See Wrist Bones, Mayo Clinic, available at https://www.mayoclinic.org/carpal-bones/img-20007898 (last visited Mar. 12, 2019).

[15]An osteophyte is commonly known as a bone spur, which is a small, smooth projection that develops on the surface of a normal bone. Bone Spurs, Laser Spine Institute, available at https://www.laserspineinstitute.com/back_problems/spinal_bone_spurs/ (last visited Mar. 12, 2019).

plaintiff was consistently 100% disabled (Tr. 454-618).

b. Dr. Shanker Krishnamurthy

Plaintiff visited Dr. Shanker Krishnamurthy, an ortho-
pedic surgeon, for an independent orthopedic evaluation on August
30, 2013 (Tr. 379). Dr. Krishnamurthy noted that plaintiff
presented with a slow gait and that she remained very stiff
throughout the evaluation (Tr. 380). During her physical exami-
nation, plaintiff exhibited a lumbar spine flexion of 0 to 20
degrees, lateral flexion of 0 to 10 degrees and extension of 0
degrees (Tr. 380). Plaintiff's straight-leg-raising tests were
negative bilaterally and her reflexes were normal (Tr. 380).
However, she exhibited decreased sensations at L4-L5 (Tr. 380).
Dr. Krishnamurthy diagnosed plaintiff with low back pain and
right-sided radiculopathy (Tr. 381). Dr. Krishnamurthy opined
that plaintiff was moderately to markedly, partially impaired and
that plaintiff should refrain from lifting objects over ten
pounds and refrain from repetitive bending, pushing, pulling or
twisting activities (Tr. 381). Dr. Krishnamurthy deferred his
treatment recommendation until after his review of plaintiff's
lumbar spine MRI (Tr. 381).

Plaintiff visited Dr. Krishnamurthy again on January
17, 2014 (Tr. 376). Plaintiff reported lower back that radiated
into both legs with associated numbness and weakness (Tr. 376).

Plaintiff presented with normal gait and her straight-leg-raising tests were negative bilaterally (Tr. 377). During her physical examination, plaintiff exhibited a lumbar spine flexion of 0 to 40 degrees, lateral flexion of 0 to 20 degrees and extension of 0 to 10 degrees (Tr. 377). Plaintiff's reflexes and muscle strength were normal, but she exhibited decreased sensations at L4-L5 (Tr. 377). Dr. Krishnamurthy diagnosed plaintiff with low back pain, lumbar radiculopathy and a herniated disc at L4-L5 (Tr. 377). Dr. Krishnamurthy opined that plaintiff was moderately, partially impaired, and that she could return to work with the restrictions of not lifting anything greater than 20 pounds and refraining from repetitive bending, pushing or pulling activities (Tr. 378). Dr. Krishnamurthy recommended that plaintiff be referred for steroid injections and pain management (Tr. 377).

Plaintiff next visited Dr. Krishnamurthy on April 11, 2014 and reported that she was in severe pain during the appointment (Tr. 775). Plaintiff claimed that her daily activities consisted of getting out of bed, brushing her teeth, taking her medication and going to doctors' appointments (Tr. 776). Plaintiff presented with a normal gait and her straight-leg-raising tests were negative bilaterally (Tr. 776). Plaintiff exhibited a lumbar spine flexion of 0 to 20 degrees, lateral

flexion of 0 to 10 degrees and extension of 0 degrees (Tr. 776). Plaintiff's neurological examination was normal (Tr. 776).

Dr. Krishnamurthy diagnosed plaintiff with low back pain, lumbar radiculopathy and a herniated disc at L4-L5 (Tr. 776). Dr. Krishnamurthy opined that plaintiff was moderately, partially impaired (Tr. 777). Dr. Krishnamurthy recommended that plaintiff see a spine specialist, but noted that he believed plaintiff was exaggerating her symptoms (Tr. 776-77).

Plaintiff visited Dr. Krishnamurthy again on July 11, 2014 and reported that her condition remained unchanged since her last appointment (Tr. 708). Plaintiff presented with a normal gait and reported that she did not require cane to walk (Tr. 709). Plaintiff's straight-leg-raising tests were negative bilaterally and her muscle strength, sensations and reflexes were normal (Tr. 709). Plaintiff exhibited a lumbar spine flexion of 0 to 30 degrees, lateral flexion of 0 to 10 degrees and extension of 0 to 10 degrees (Tr. 709).

Dr. Krishnamurthy continued to diagnose plaintiff with low back pain and radiculopathy and continued to opine that she had a moderate, partial impairment and could return to work with lifting and bending restrictions (Tr. 709). He also continued to express concern that plaintiff was exaggerating her symptoms (Tr. 709).

Plaintiff visited Dr. Krishnamurthy again on February 13, 2015 (Tr. 713). Plaintiff reported that she spends her days at home and goes to church on Sundays (Tr. 713). Plaintiff further reported that she could hardly get out of bed for nine consecutive days because of her back pain (Tr. 713). Dr. Krishnamurthy noted that when he attempted to inquire further about plaintiff's daily activities, she did not want to answer (Tr. 713).

Plaintiff presented with normal gait and did not have any difficulty moving around during her appointment (Tr. 714). Plaintiff's straight-leg-raising tests were negative bilaterally, and her muscle strength and reflexes were normal (Tr. 714). Plaintiff exhibited some decreased sensation at L5-S1 (Tr. 714). Plaintiff exhibited a lumbar spine flexion of 0 to 20 degrees, lateral flexion of 0 to 10 degrees and extension of 0 degrees (Tr. 714). Dr. Krishnamurthy continued to diagnose plaintiff with low back pain and radiculopathy, and continued to opine that plaintiff could return to work with lifting and bending restrictions and that plaintiff was overstating her symptoms (Tr. 714-15).

Plaintiff visited Dr. Krishnamurthy again on May 8, 2015 and reported constant pain in her lower back that radiated to her right leg (Tr. 721). Plaintiff presented with normal gait and her straight-leg-raising tests were negative bilaterally (Tr.

721). Plaintiff's reflexes were normal, and she exhibited full muscle strength (Tr. 721). Plaintiff exhibited some decreased sensation in her left leg (Tr. 721). Plaintiff exhibited a lumbar spine flexion of 0 to 25 degrees, lateral flexion of 0 to 15 degrees and extension of 0 to 10 degrees (Tr. 721).

Dr. Krishnamurthy diagnosed plaintiff with low back pain, right-sided radicular symptoms and symptom magnification (Tr. 721). Dr. Krishnamurthy continued to opine that plaintiff had a moderate partial disability and that she could return to work with lifting and bending restrictions (Tr. 722).

Plaintiff next visited Dr. Krishnamurthy on July 24, 2015 and reported pins and needles in her right hand and intermittent buttocks and right leg pain (Tr. 729-30). Plaintiff presented with a normal gait, and her straight-leg-raising tests were negative bilaterally (Tr. 730). Plaintiff's muscle strength, sensations and reflexes were all normal (Tr. 730). Plaintiff exhibited a lumbar spine flexion of 0 to 20 degrees, lateral flexion of 0 to 10 degrees and extension of 0 degrees (Tr. 730). Dr. Krishnamurthy expressed concerns over these measurements because plaintiff "had absolutely no difficulty getting on and off the examination table" and did "not demon-strate any evidence or discomfort doing [the] maneuvers" (Tr. 730). Plaintiff exhibited full muscle strength and grip in her right wrist, but had some decreased sensations in the right

median nerve distribution[16] (Tr. 721).

Dr. Krishnamurthy diagnosed plaintiff with low back pain, right-sided radiculopathy, "symptom magnification" and status post contusion to the right wrist that was resolved (Tr. 730-31). Dr. Krishnamurthy continued to opine that plaintiff had a moderate partial disability and that she could return to work with lifting and bending restrictions; however, he stated that he did not believe that plaintiff would ever return to gainful employment (Tr. 731).

Plaintiff visited Dr. Krishnamurthy again on November 6, 2015 and reported lower back pain that radiated into her right buttock and numbness in her right leg (Tr. 736). Plaintiff presented with a normal gait and her straight-leg-raising tests were negative bilaterally (Tr. 737). Plaintiff's muscle strength and reflexes were all normal, but she exhibited some decreased sensations in her right leg (Tr. 737). Plaintiff exhibited a lumbar spine flexion of 0 to 20 degrees, lateral flexion of 0 to 15 degrees and extension of 0 to 10 degrees (Tr. 737). Plaintiff exhibited full muscle strength and grip in her right wrist (Tr. 737).

---

[16]The median nerve is an extremely long nerve that spans from the upper arm into the carpal tunnel area of the hand. Carpal tunnel syndrome is a common cause of median nerve pain in the wrist. Median Nerve, Healthline, available at https://www.healthline.com/human-body-maps/median-nerve (last visited Mar. 12, 2019).

Dr. Krishnamurthy continued to diagnose plaintiff with low back pain, right-sided radiculopathy and "symptom magnification", but deferred his diagnosis of her right wrist until he could review her most recent MRI (Tr. 737). Dr. Krishnamurthy continued to opine that plaintiff's only work restrictions were lifting objects over 20 pounds and repetitive bending, pushing or pulling (Tr. 738).

Plaintiff visited Dr. Krishnamurthy again on March 4, 2016 and reported lower back pain (Tr. 801-02). Plaintiff presented with normal gait and her straight-leg-raising tests were negative bilaterally (Tr. 802). Plaintiff's muscle strength, reflexes and sensations were all normal (Tr. 802). Plaintiff exhibited a lumbar spine flexion of 0 to 40 degrees, lateral flexion of 0 to 25 degrees and extension of 0 to 15 degrees (Tr. 737). Plaintiff exhibited full muscle strength and grip in her right hand (Tr. 802).

Dr. Krishnamurthy diagnosed plaintiff with low back pain with symptoms of radiculopathy and status post excision right pisiform surgery (Tr. 803). Dr. Krishnamurthy opined that plaintiff could return to work with lifting and bending restrictions and that plaintiff was exaggerating her symptoms (Tr. 803).

### c.  Dr. Mark Johnston

Plaintiff visited Dr. Mark Johnston, an internist, for an independent medical evaluation on April 21, 2014 (Tr. 532). Plaintiff reported sharp lower back that radiated to both legs that she described as a seven to eight out of ten (Tr. 532). Plaintiff reported that prolonged sitting and standing, bending and lifting exacerbated the pain (Tr. 532). Plaintiff also reported some continuing pain and discomfort in her right wrist (Tr. 532). Plaintiff claimed that she was able to dress and bathe herself, but that she needed assistance with daily chores, such as cooking, cleaning, laundry or shopping (Tr. 533).

Plaintiff presented with normal gait and was able to get up from the examination table without assistance (Tr. 533). Plaintiff exhibited full range of motion in her cervical spine, shoulders, elbows, forearms, wrists, hips, knees and ankles (Tr. 534). Her lumbar spine extension was 0 degrees, flexion was 0 to 40 degrees, lateral flexion was 0 to 30 degrees and rotation was 0 to 30 degrees (Tr. 534). Plaintiff's seated straight-leg-raising tests were negative bilaterally, but she experienced some medial knee pain at 30 degrees from the supine position (Tr. 534). Plaintiff's neurological examination was normal and she exhibited full muscle strength in her arms, legs and wrists with no muscle atrophy (Tr. 534).

Dr. Johnston diagnosed plaintiff with chronic low back pain and tendinitis in her right wrist (Tr. 534). Dr. Johnston opined that plaintiff had moderate limitations with bending and lifting, and mild limitations with prolonged sitting, prolonged standing and gross manipulation with her right hand (Tr. 534-35).

### d. Dr. Douglas A. Schwartz

Plaintiff visited Dr. Douglas A. Schwartz, a physical medicine and rehabilitation specialist, on May 3, 2014 with respect to her workers' compensation claim (Tr. 536). Plaintiff reported lower back pain with numbness and tingling in her legs (Tr. 536). Dr. Schwartz's notes with respect to plaintiff's physical examination are illegible; however, he filled out a functional capacity form for plaintiff based on his examination (Tr. 537, 616). Dr. Schwartz opined that plaintiff could never kneel, bend, stoop, squat or operate machinery, that plaintiff could occasionally lift objects up to five pounds, walk, sit, stand, climb, reach overhead or drive a vehicle, and that plaintiff could constantly manipulate and grasp small objects (Tr. 616). Dr. Schwartz further opined that plaintiff was unable to meet the requirements of sedentary work (Tr. 616).

e.  David Drier, DC

Plaintiff visited David Drier, DC, a licensed chiropractor, for an independent chiropractic evaluation on July 21, 2015 (Tr. 750).  Plaintiff reported constant lower back pain and occasional right leg pain that was exacerbated by prolonged sitting (Tr. 751).  Plaintiff reported that medication relieved the pain (Tr. 751).  Plaintiff presented with a normal gait and was able to move around during the examination without assistance (Tr. 752).  Plaintiff's straight-leg-raising tests were negative bilaterally, and she exhibited a normal range of motion in her lumbar spine (Tr. 752).  Plaintiff exhibited full muscle strength with no atrophy in her legs, and her sensations and reflexes were normal (Tr. 752).

Drier diagnosed plaintiff with post-chronic lumbar syndrome, or chronic lower back pain (Tr. 752).  Drier opined that plaintiff had a mild partial spinal disability of 20% and that plaintiff could resume her usual work activities with the restrictions of not lifting objects over 25 pounds, no repetitive bending and no sitting for over 25 minutes at a time (Tr. 752). He further opined that plaintiff's objective signs did not fully support her subjective symptoms (Tr. 752).

Plaintiff visited Drier for a second independent chiropractic evaluation on October 20, 2015 (Tr. 698).  Plaintiff

reported that her condition had not improved since her last visit and that she was still experiencing lower back and right leg pain that was exacerbated by prolonged sitting (Tr. 700). Plaintiff presented with normal gait and was able to move around during the examination without assistance (Tr. 700). Plaintiff's straight-leg-raising tests were negative bilaterally, and she exhibited a normal range of motion in her lumbar spine (Tr. 700). Plaintiff exhibited full muscle strength with no atrophy in her legs, and her sensations and reflexes were normal (Tr. 700).

Drier continued to opine that plaintiff had a mild partial spinal disability of 20%, that plaintiff could resume her usual work activities with his previously stated restrictions and that the objective signs did not fully support plaintiff's subjective symptoms (Tr. 701).

Plaintiff visited Drier for a third independent chiropractic evaluation on March 8, 2016 (Tr. 807). Plaintiff again reported that her condition had not improved since her last appointment and she continued to experience constant lower back pain (Tr. 809). Plaintiff presented with a normal gait and was able to move around during the examination without assistance (Tr. 809). Plaintiff's straight-leg-raising tests were negative bilaterally and she exhibited a normal range of motion in her lumbar spine (Tr. 810). Plaintiff exhibited full muscle strength

with no atrophy in her legs, and her sensations and reflexes were normal (Tr. 810).

Drier continued to opine that plaintiff had a mild partial spinal disability of 20%, that plaintiff could resume her usual work activities with his previously stated restrictions and that plaintiff's objective signs did not fully support her subjective symptoms (Tr. 810).

### 3. Psychological Records for the Relevant Time Period

#### a. Dr. Stephen Koretsky

Plaintiff visited Dr. Stephen Koretsky, a licensed psychologist, on December 26, 2013 (Tr. 307). Plaintiff reported that she was very depressed because of her persistent lower back pain and reported the following symptoms: (1) recurrent and intrusive recollections, (2) recurrent dreams, (3) flashbacks, (4) distress and physiological reaction to similar cues associated with her workplace accident, (5) avoidance of thoughts associated with the accident, (6) avoidance of activities and people, (7) diminished interest, (8) hyper-alertness, (9) irritability, (10) sleep disturbance and (11) impaired concentration (Tr. 308). Dr. Koretsky noted that plaintiff scored a 41 on the

Beck Depression Inventory-II test,[17] which indicated severe depression, and scored a 38 on the Beck Anxiety Inventory test,[18] which indicated severe anxiety (Tr. 308). He diagnosed plaintiff with PTSD, major depressive disorder and mood disorder due to herniated discs, and opined that her prognosis was poor without amelioration of her physical symptoms (Tr. 312). He further opined that plaintiff had a mental disability that was independent of any physical disabilities (Tr. 312).

After this initial appointment, plaintiff visited Dr. Koretsky approximately twice a week until January 26, 2016 (Tr. 384-86, 396-97, 634-83).[19] On April 29, 2014, Dr. Koretsky noted that plaintiff was still exhibiting signs of depression, anxiety

---

[17]The Beck Depression Inventory-II test is a 21-item, self-report rating inventory that measures characteristic attitudes and symptoms of depression. A score range of 28 to 63 is indicative of severe depression. See Beck Depression Inventory, American Psychological Association, available at https://www.apa.org/pi/about/publications/caregivers/practice-settings/assessments/beck-depression (last visited Mar. 12, 2019).

[18]The Beck Anxiety Inventory test is a 21-item, self-report rating inventory that measures characteristic attitudes and symptoms of anxiety. A score range of 30 to 63 is indicative of severe anxiety. See Psychological Aspects of Pain, ScienceDirect, available at https://www.sciencedirect.com/topics/medicine-and-dentistry/beck-anxiety-inventory (last visited Mar. 12, 2019).

[19]The records from these biweekly sessions with Dr. Koretsky consist of only a few sentences from each session with respect to how plaintiff was feeling on a particular day. They do not contain any assessments or diagnoses by Dr. Koretsky, with the exception of the three narrative reports written on December 26, 2013, April 29, 2014 and March 19, 2015.

31

and PTSD (Tr. 637). Dr. Koretsky continued to diagnose plaintiff with PTSD, major depressive disorder and mood disorder due to herniated discs, and opined that her prognosis was poor without amelioration of her physical symptoms (Tr. 637).

On March 19, 2015, plaintiff reported continued symptoms of PTSD and anxiety (Tr. 662). Dr. Koretsky noted that plaintiff scored a 52 on the Beck Depression Inventory-II test, which indicated severe depression, and scored a 52 on the Beck Anxiety Inventory test, which indicated severe anxiety (Tr. 663). Dr. Koretsky continued to diagnose plaintiff with PTSD, major depressive disorder and mood disorder due to herniated discs, and opined that her prognosis was poor without amelioration of her physical symptoms (Tr. 663).

b. Dr. Victoria L. Londin

Plaintiff visited Dr. Victoria L. Londin for an independent psychological examination on January 5, 2014 (Tr. 687). Plaintiff reported that she was depressed about not being able to work and was anxious about falling on wet or icy surfaces (Tr. 689). She further reported that she was suffering from insomnia and that she required assistance for daily household chores (Tr. 689).

Dr. Londin noted that plaintiff was appropriately dressed and groomed for her evaluation and that she was coopera-

tive and alert (Tr. 688). Dr. Londin further noted that plain-
tiff's thought process was coherent, appropriate and logical, and
that her memory, attention and concentration were sound through-
out the examination (Tr. 688). Dr. Londin diagnosed plaintiff
with adjustment disorder[20] with mixed anxiety and depression, and
opined that plaintiff was temporarily and totally disabled (Tr.
689).

Plaintiff attended a second independent psychological
evaluation with Dr. Londin on September 3, 2014, however, Dr.
Londin's observations and opinions regarding plaintiff's mental
condition were identical to those of her January 5, 2014
evaluation (Tr. 539-41).

Plaintiff visited Dr. Londin for a third independent
psychological examination on June 22, 2015 (Tr. 694). Dr.
Londin's observations and opinions regarding plaintiff's mental
condition were, again, identical to those of her January 5 and
September 3, 2014 evaluations, except that Dr. Londin noted
plaintiff's mood had slightly improved with the birth of her
granddaughter (Tr. 694-95). However, even with this improvement,
Dr. Londin opined that plaintiff was still temporarily and

---

[20]Adjustment disorders are stress-related conditions in
which patients experience more stress than would normally be
expected in response to a stressful and unexpected event. See
Adjustment Disorders, Mayo Clinic, available at
https://www.mayoclinic.org/diseases-conditions/symptoms-
causes/syc-20355224 (last visited Mar. 12, 2019).

totally disabled (Tr. 695).

### c. Dr. Melissa Antiaris

Plaintiff visited Dr. Melissa Antiaris on April 21, 2014 for an independent psychological evaluation (Tr. 528). Plaintiff reported that she was experiencing insomnia, anxiety, depression, helplessness, fatigue, loss of interest in activities, low self esteem, panic attacks, social withdrawal and irritability (Tr. 528-29). Plaintiff denied suicidal or homicidal thoughts (Tr. 529). Plaintiff reported that she was able to dress, bathe and groom herself, but that she needed her children's assistance for household chores (Tr. 530). Plaintiff claimed that she spent most of her day watching television (Tr. 530).

Dr. Antiaris noted that plaintiff was well groomed and dressed appropriately and that she was alert, oriented and cooperative during the evaluation (Tr. 529). Plaintiff's attention, concentration and memory were intact, and plaintiff was able to count and complete simple calculations (Tr. 530). Dr. Antiaris assessed plaintiff's cognitive functioning as "average" and appropriate to her experience (Tr. 530). Dr. Antiaris stated that she had no concerns regarding plaintiff's adaptive functioning (Tr. 530).

Dr. Antiaris diagnosed plaintiff with adjustment

34

disorder and panic disorder (Tr. 531). Dr. Antiaris opined that plaintiff had no limitations with following and understanding simple directions; performing simple or complex tasks independently; maintaining attention, concentration and a regular schedule; learning new tasks; making appropriate decisions and relating to others (Tr. 530). Dr. Antiaris further opined that plaintiff had moderate limitations in her ability to handle stress, but that plaintiff's symptoms were not significant enough to interfere with plaintiff's ability to function on a daily basis (Tr. 530-31)

### d. Dr. Leslie Citrome

Plaintiff visited Dr. Leslie Citrome for an independent psychological evaluation on November 23, 2015 (Tr. 744). Plaintiff reported that she was unable to lift objects and required assistance with household chores (Tr. 745). She further reported that she was able to drive locally and typically spent her days at home doing nothing (Tr. 745). Plaintiff claimed that she did not watch television and did not have any hobbies (Tr. 745). Plaintiff also reported that she was suffering from insomnia, loss of appetite, hopelessness, irritability, concentration impairment and anxiety (Tr. 745). Plaintiff described her anxiety as a seven out of ten (Tr. 745).

Dr. Citrome noted that plaintiff was cooperative, oriented and exhibited a normal and logical thought process throughout the evaluation (Tr. 745-46). Dr. Cintrome noted that plaintiff's mood appeared to depressed and that plaintiff became tearful at several points during the examination (Tr. 745-46). Dr. Citrome diagnosed plaintiff with major depressive disorder and chronic pain, and opined that plaintiff had a moderate, temporary, partial disability with respect to her psychological symptoms (Tr. 746).

Plaintiff visited Dr. Citrome for a second evaluation on April 4, 2016 (Tr. 825). Plaintiff reported that she was still suffering from insomnia, loss of appetite, irritability, concentration impairment and anxiety (Tr. 825). Dr. Citrome noted that plaintiff was cooperative, oriented and exhibited a normal and logical thought process throughout the evaluation, and that her mood had slightly improved since her last visit (Tr. 826). Dr. Citrome continued to diagnose plaintiff with major depressive disorder and chronic pain, and opined that plaintiff had a moderate, temporary, partial disability with respect to her psychological symptoms (Tr. 827).

e.   Dr. Jeffrey Newton

Plaintiff visited Dr. Jeffrey Newton, a psychiatrist, on January 28, 2016 and reported that she was unable to carry out

her daily activities and had feelings of depression (Tr. 816-17). Dr. Newton noted that plaintiff came across as very depressed and had difficulty concentrating during the examination (Tr. 817). Dr. Newton diagnosed plaintiff with major depression, chronic pain and associated altered life circumstances (Tr. 817).

Plaintiff visited Dr. Newton again on March 3, 2016 and reported continued depression (Tr. 818). Without any examination notes, assessments or observations, Dr. Newton opined that plaintiff's depression rendered her totally and permanently disabled (Tr. 818).

D. Proceedings Before the ALJ

1. Plaintiff's Testimony

Plaintiff testified that she was still experiencing back pain that radiated into her buttocks and that she took her prescribed pain medications as needed (Tr. 61-62). Plaintiff testified that some of her pain medications made her drowsy and that she would need to sleep for a couple of hours each day after taking them (Tr. 81). Plaintiff claimed that she was unable to sit for more than 10 to 15 minutes at a time because of her lower back and buttocks pain (Tr. 80). She further claimed that she could only stand for 10 minutes at a time and was only able to walk approximately half a block before needing to rest (Tr. 80-81).

Plaintiff testified that she stayed home all day because she continued to be depressed about not being able to work (Tr. 82). She also claimed that she experienced crying spells two to four times per day and still had "flashbacks" of her January 8, 2013 fall (Tr. 82). Plaintiff testified that she had lost weight because she was very anxious and did not like to eat (Tr. 73). Plaintiff claimed that her children and her husband take care of all the household chores because she is unable to cook, clean or do laundry (Tr. 73). However, she stated that she drives herself to her doctors' appointments approximately four times per week (Tr. 84).

## 2. Vocational Expert Testimony

Vocational expert Esperanza Distefano ("the VE") also testified at the hearing. The VE testified that plaintiff's past work as a bank deposit operations manager defined in the United States Department of Labor's Dictionary of Occupational Titles ("DOT") as DOT Code 186.117-086, was normally considered light, skilled work; however, based on plaintiff's testimony that she would frequently lift boxes up to 50 pounds, the VE opined that plaintiff performed her job duties at medium exertion (Tr. 86-87). The ALJ asked the VE to consider possible jobs for a hypothetical person of plaintiff's age, education and work

background, who was limited to a range of light work[21], could understand, remember and carry out simple work, could adapt to routine work changes, could occasionally stoop, push, pull and reach overhead and could not operate a motor vehicle or work at unprotected heights (Tr. 87). The VE testified that such a hypothetical individual could not perform plaintiff's past work (Tr. 87).

The VE testified that such an individual could, however, work as a marker, DOT Code 209.587-034, with 282,214 jobs nationally, a router, DOT Code 222.587-038, with 53,046 jobs nationally, an office helper, DOT Code 239.567-010, with 3,588 jobs nationally and a photocopying machine manager, DOT 207.685-014, with 17,986 jobs nationally (Tr. 88).

On cross-examination by plaintiff's counsel, the VE stated that a hypothetical person of plaintiff's age, education and work background, who was limited to a range of light work, would not be able to find employment if such a person was consistently absent from work three days per month or if such a

---

[21] The regulations define "light work" as work which

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b).

person needed to be off duty for two hours per day (Tr. 92-93).

III.  Analysis

    A.  Applicable
        Legal Principles

       1.  Standard of Review

The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard.  42 U.S.C. § 405(g); Lockwood v. Comm'r of Soc. Sec. Admin., --- F.3d --- , 2019 WL 366695 at *3 (2d Cir. Jan. 23, 2019); Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2014) (per curiam); Talavera v. Astrue, 697 F.3d 145, 151 (2d Cir. 2012); Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008).  Moreover, the court cannot "affirm an administrative action on grounds different from those considered by the agency."  Lesterhuis v. Colvin, 805 F.3d 83, 86 (2d Cir. 2015), quoting Burgess v. Astrue, supra, 537 F.3d at 128.

The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence.  Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003), citing Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn

the ALJ's decision." Ellington v. Astrue, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (Marrero, D.J.). However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

"'Substantial evidence' is 'more than a mere scintilla. It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" Talavera v. Astrue, supra, 697 F.3d at 151, quoting Richardson v. Perales, 402 U.S. 389, 401 (1971). Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam), quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" Selian v. Astrue, supra, 708 F.3d at 417 (citation omitted).

## 2. Determination
## Of Disability

A claimant is entitled to DIB if she can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months."[22] 42 U.S.C. § 423(d)(1)(A); see Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both impairment and inability to work must last twelve months). The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be

> of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [the claimant] lives, or whether a specific job vacancy exists for [the claimant], or whether [the claimant] would be hired if [the claimant] applied for work.

42 U.S.C. § 423(d)(2)(A). In addition, to obtain DIB, the claimant must have become disabled between the alleged onset date and the date on which she was last insured. See 42 U.S.C. §§

---

[22]The standards that must be met to receive SSI benefits under Title XVI of the Act are the same as the standards that must be met in order to receive DIB under Title II of the Act. Barnhart v. Thomas, 540 U.S. 20, 24 (2003). Accordingly, cases addressing the former are equally applicable to cases involving the latter.

416(i), 423(a); 20 C.F.R. §§ 404.130, 404.315; McKinstry v.
Astrue, 511 F. App'x 110, 111 (2d Cir. 2013) (summary order),
citing Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008). In
making the disability determination, the Commissioner must
consider: "'(1) the objective medical facts; (2) diagnoses or
medical opinions based on such facts; (3) subjective evidence of
pain or disability testified to by the claimant or others; and
(4) the claimant's educational background, age, and work experi-
ence.'" Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per
curiam), quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir.
1983) (per curiam).

In determining whether an individual is disabled, the
Commissioner must follow the five-step process required by the
regulations. 20 C.F.R. § 404.1520(a)(4)(i)-(v); see Selian v.
Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697
F.3d at 151. The first step is a determination of whether the
claimant is engaged in substantial gainful activity ("SGA"). 20
C.F.R. § 404.1520(a)(4)(i). If she is not, the second step
requires determining whether the claimant has a "severe medically
determinable physical or mental impairment." 20 C.F.R.
§ 404.1520(a)(4)(ii). If the claimant does not have a severe
medically determinable impairment or combination of impairments,
she is not disabled. See Henningsen v. Comm'r of Soc. Sec.
Admin., 111 F. Supp. 3d 250, 264 (E.D.N.Y. 2015); 20 C.F.R. §

404.1520(c).  If she does, the inquiry at the third step is
whether any of claimant's impairments meet one of the listings in
Appendix 1 of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii).
If the answer to this inquiry is affirmative, the claimant is
disabled.  20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not meet any of the listings in
Appendix 1, step four requires an assessment of the claimant's
residual functional capacity ("RFC") and whether the claimant can
still perform her past relevant work given her RFC.  20 C.F.R.
§ 404.1520(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at
24-25.  If she cannot, then the fifth step requires assessment of
whether, given the claimant's RFC, she can make an adjustment to
other work.  20 C.F.R. § 404.1520(a)(4)(v).  If she cannot, she
will be found disabled.  20 C.F.R. § 404.1520(a)(4)(v).

RFC is defined in the applicable regulations as "the
most [the claimant] can still do despite her limitations."
20 C.F.R. § 404.1545(a)(1).  To determine RFC, the ALJ
"'identif[ies] the individual's functional limitations or re-
strictions and assess[es] . . . [her] work-related abilities on a
function-by-function basis, including the functions in paragraphs
(b),(c), and (d) of 20 [C.F.R. §] 404.1545 . . . .'"  Cichocki v.
Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), quoting
Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *1 (July
2, 1996).  The results of this assessment determine the claim-

ant's ability to perform the exertional demands of sustained work which may be categorized as sedentary, light, medium, heavy or very heavy.[23]  20 C.F.R. § 404.1567; see Schaal v. Apfel, 134 F.3d 496, 501 n.6 (2d Cir. 1998).  This ability may then be found to be limited further by nonexertional factors that restrict the claimant's ability to work.[24]  See Michaels v. Colvin, 621 F. App'x 35, 38 n.4 (2d Cir. 2015) (summary order); Zabala v. Astrue, 595 F.3d 402, 410-11 (2d Cir. 2010).

The claimant bears the initial burden of proving disability with respect to the first four steps.  Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than her past work.  Selian v. Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537 F.3d at 128; Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended in part on other grounds on reh'g, 416 F.3d 101 (2d Cir. 2005).

---

[23]Exertional limitations are those which "affect only [the claimant's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)."  20 C.F.R. § 404.1569a(b).

[24]Nonexertional limitations are those which "affect only [the claimant's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because of nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing, tolerating dust or fumes, or manipulative or postural functions, such as reaching, handling, stooping, climbing, crawling or crouching.  20 C.F.R. § 404.1569a(c).

In some cases, the Commissioner can rely exclusively on the Medical-Vocational Guidelines (the "Grids") contained in C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step. Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995). "The Grid[s] take[] into account the claimant's RFC in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid[s] indicate[] whether the claimant can engage in any other substantial gainful work which exists in the national economy." Gray v. Chater, supra, 903 F. Supp. at 298; see Butts v. Barnhart, supra, 388 F.3d at 383.

Exclusive reliance on the Grids is not appropriate where nonexertional limitations "significantly diminish [a claimant's] ability to work." Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986); accord Butts v. Barnhart, supra, 388 F.3d at 383. "Significantly diminish" means "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Bapp v. Bowen, supra, 802 F.2d at 606 (footnote omitted); accord Selian v. Astrue, supra, 708 F.3d at 421; Zabala v. Astrue, supra, 595 F.3d at 411. Before an ALJ determines that sole reliance on the Grids is proper in determining whether a plaintiff is disabled under the Act, he must ask and answer the intermediate question -- whether

the claimant has nonexertional limitations that significantly diminish her ability to work; an ALJ's failure to explain how he reached his conclusion to this question is "plain error". <u>See</u> <u>Maldonado v. Colvin</u>, 15 Civ. 4016 (HBP), 2017 WL 775829 at *21- *23 (S.D.N.Y. Feb. 23, 2017) (Pitman, M.J.); <u>see</u> <u>also</u> <u>Bapp v.</u> <u>Bowen</u>, <u>supra</u>, 802 F.2d at 606 ; <u>St. Louis ex rel. D.H. v. Comm'r</u> <u>of Soc. Sec.</u>, 28 F. Supp. 3d 142, 148 (N.D.N.Y. 2014); <u>Baron v.</u> <u>Astrue</u>, 11 Civ. 4262 (JGK)(MHD), 2013 WL 1245455 at *19 (S.D.N.Y. Mar. 4, 2013) (Dolinger, M.J.) (Report & Recommendation), <u>adopted at</u>, 2013 WL 1364138 (S.D.N.Y. Mar. 26, 2013) (Koeltl, D.J.). When the ALJ finds that the nonexertional limitations do significantly diminish a claimant's ability to work, then the Commissioner must introduce the testimony of a vocational expert or other similar evidence in order to prove "that jobs exist in the economy which [the] claimant can obtain and perform." <u>Butts</u> <u>v. Barnhart</u>, <u>supra</u>, 388 F.3d at 383-84 (internal quotation marks omitted); <u>see</u> <u>Heckler v. Campbell</u>, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particu- lar limitations must be considered.").

B.   The ALJ's Decision

        The ALJ applied the five-step analysis described above and determined that plaintiff was not disabled (Tr. 18-30).

As an initial matter, the ALJ found that plaintiff met the insured status requirements of the Act through December 31, 2017 (Tr. 20).

At step one, the ALJ found that plaintiff had not engaged in SGA since June 26, 2013 (Tr. 20).

At step two, the ALJ concluded that plaintiff suffered from the severe impairments of lumbar disc herniation, PTSD, major depressive disorder and right wrist arthritis (Tr. 20).

At step three, the ALJ found that plaintiff's impairments did not meet or medically equal the criteria of the listed impairments and that plaintiff was not, therefore, entitled to a presumption of disability (Tr. 20-21). In reaching his conclusion, the ALJ stated that he gave "particular attention" to Listing 1.02 and concluded that "the specific criteria required of the listing was not demonstrated by the available medical evidence" because it did "not demonstrate that [plaintiff] ha[d] the [required] degree of difficulty in performing fine and gross movements" (Tr. 20). The ALJ also made specific mention of Listing 1.04 and concluded that plaintiff did not meet this listing because "the medical evidence [did] not establish the requisite evidence of nerve root compression, spinal arachnoiditis[25] or lumbar spinal stenosis" (Tr. 21). Finally,

---

[25]Arachnoiditis is a pain disorder caused by inflammation of the membranes that surround and protect the nerves of the spinal
(continued...)

the ALJ concluded that plaintiff also did not meet Listings 12.04
or 12.06 because plaintiff's mental impairment limitations did
not satisfy either paragraph B or C of these listings (Tr. 21).
Specifically, the ALJ found that plaintiff only had "mild
restriction[s]" in her activities of daily living, "mild diffi-
culties" in her social functioning, "moderate difficulties" with
her concentration and "experienced no episodes of decompensation"
(Tr. 21).

The ALJ then determined that plaintiff retained the RFC
to perform light work with the following limitations:

> [Plaintiff] can understand, remember and carryout
> simple work and adapt to routine workplace changes, and
> can occasionally stoop, and frequently handle and
> finger with the dominant right upper extremity, occa-
> sionally reach overhead with the bilateral upper ex-
> tremity and occasionally push and pull. She cannot
> operate a motor vehicle, and not working at unprotected
> heights (Tr. 21).

To reach his RFC determination, the ALJ examined the opinions of
the treating and consulting physicians and determined the weight
to be given to each opinion based on the objective medical record
(Tr. 24-27).

The ALJ afforded "little weight" to the opinion of Dr.
Koretsky that plaintiff was disabled due to her mental health

---

[25](...continued)
cord, which typically causes a severe stinging or "burning" pain
and can lead to neurological problems. Arachnoiditis, The
Cleveland Clinic, available at https://my.clevelandclinic.org/
health/diseases/12062-arachnoiditis (last visited Mar. 12, 2019)

symptoms because "Dr. Koretsky did not include any clear func-
tional limitations and did not adequately explain why he was able
to determine [that plaintiff] was totally disabled" (Tr. 24-25).
The ALJ further found that Dr. Koretsky's opinion was inconsis-
tent with plaintiff's description of her daily activities and
with the opinions of Drs. Citrome and Antiaris (Tr. 24-25).

The ALJ afforded "no weight" to the opinion of Dr.
Polifrone that plaintiff was 100% disabled because (1) the
workers' compensation disability standard is different than the
social security standard, (2) Dr. Polifrone did not explain
plaintiff's limitations or what the percentage of disability was
based on and (3) the opinion was inconsistent with the opinions
of Drs. Johnston and Dr. Krishnamurthy (Tr. 25).

The ALJ afforded "little weight" to the opinions of Dr.
Schwartz that plaintiff was "totally disabled from any and all
work" and that plaintiff "was limited to less than sedentary
work" because they "were not well supported or explained" (Tr.
25). The ALJ also found that Dr. Schwartz's opinions were
inconsistent with plaintiff's conservative treatment and with the
opinions of Dr. Johnston, Dr. Krishnamurthy and chiropractor
Drier (Tr. 25).

The ALJ afforded "slight weight" to Dr. Antiaris'
opinions that there were no limitations on plaintiff's ability to
follow simple instructions, perform tasks independently, maintain

50

concentration, learn new tasks, make appropriate decisions and relate adequately with others because "the opinion [was] not supported by subsequent reports, which show[ed] ongoing mental health complaints" (Tr. 25).

The ALJ afforded "significant weight" to Dr. Johnston's opinions that plaintiff had moderate limitations with bending and mild limitations with prolonged sitting, prolonged standing and gross manipulation because Dr. Johnston was an examining source and his opinions were consistent with the overall medical record and the opinions of Dr. Krishnamurthy (Tr. 26). The ALJ further found that Dr. Johnston's opinions were "well supported by [a] thorough physical examination" (Tr. 26).

The ALJ afforded "great weight" to Dr. Krishnamurthy's "opinions [that were] consistent with light exertional work . . . [because] they were based on thorough examinations throughout the relevant period and [were] largely consistent with the overall evidence in the record" (Tr. 26). However, the ALJ gave "little weight" to Dr. Krishnamurthy's opinions that limited plaintiff to less than light work because they were "outweighed by Dr. Krishnamurthy's consistent findings" that plaintiff's only functional limitations were refraining from lifting items greater than 20 pounds and refraining from repetitive bending, pulling and pushing (Tr. 26).

The ALJ afforded "little weight" to the opinions of Dr.

Londin that plaintiff had a "temporary and total disability" based on her mental impairments because the opinions were "vague, poorly supported and [did] not include clear functional limitations" (Tr. 26).

The ALJ afforded "some weight" to the opinions of chiropractor Drier that plaintiff "had a mild partial spinal disability of 20%", that plaintiff could "perform her usual work and daily activities with restrictions of no lifting over 25 [pounds], no repetitive bending, and no sitting for over 25 minutes at a time" and that plaintiff's subjective complaints were not supported by objective signs (Tr. 26). The ALJ found that while Drier was not an acceptable medical source because he was a chiropractor, Drier examined plaintiff numerous times and his opinions were well supported by his examination notes and the overall record (Tr. 26). The ALJ gave "great weight" to Drier's opinions that were "consistent with the range of light work [because] they [were] supported by the opinions of Dr. Krishnamurthy and Johnston" (Tr. 26-27).

The ALJ afforded "some weight" to the opinion of Dr. Citrome that plaintiff "had a moderate temporarily partial disability related to her major depressive disorder" because it was not well explained or supported and did "not include a clear functional assessment" (Tr. 27).

The ALJ afforded "little weight" to Dr. Newton's

opinion that plaintiff was totally and permanently disabled because Dr. Newton "had a very limited treatment history with [plaintiff]" and his opinion "did not include a clear functional assessment" (Tr. 27). The ALJ also noted that Dr. Newton's opinion was "not supported by the exams and opinions of Drs. Citrome and Antiaris" (Tr. 27).

The ALJ also considered plaintiff's May 29, 2013 MRI, plaintiff's June 30, 2013 EMG study, plaintiff's October 9, 2013 EMG study, plaintiff's December 11, 2015 wrist surgery and plaintiff's testimony in determining plaintiff's RFC (Tr. 23-24, 27). The ALJ found that while plaintiff's medically determinable impairments could reasonably have caused her alleged symptoms, a review of the entire case record showed that plaintiff's statements regarding their intensity, persistence and limiting effects were not credible (Tr. 27). The ALJ noted that plaintiff's course of treatment throughout the entire record consisted of medication, physical therapy and home exercises and that any side effects from her medications would not prevent plaintiff from engaging in light work (Tr. 27). The ALJ further stated that Dr. Krishnamurthy, Dr. Johnston and Drier all found that plaintiff was exaggerating her symptoms (Tr. 27). Finally, the ALJ noted that plaintiff "betrayed no evidence of debilitating symptoms while testifying at the hearing" (Tr. 27-28).

At step four, the ALJ concluded that, because plaintiff

was limited to light work, plaintiff was unable to perform her past work as a bank deposit manager, which plaintiff performed at medium physical exertion level (Tr. 28).

At step five, relying on the testimony of the VE, the ALJ found that jobs existed in significant numbers in the national economy that plaintiff could perform, given her RFC, age and education (Tr. 29). The ALJ acknowledged that plaintiff was 54 years and 11 months at the time of the decision, making her a "borderline" case for someone of advanced age (Tr. 29). However, the ALJ found that based on plaintiff's high school education and significant work experience, using plaintiff's chronological age of 54 years old was appropriate (Tr. 29).

C.  Analysis of
    the ALJ's Decision

Plaintiff's motion consists of statements cherry-picked from the transcript of the March 18, 2016 hearing interspersed with comments by counsel that appear to be copied from his letter motion to the Appeals Council from August 25, 2016 (Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, dated June 4, 2018 (D.I. 17) ("Pl. Memo."); Tr. 172-83). Plaintiff's motion is completely devoid of any legal arguments or cohesive organization. Construed liberally, plaintiff appears to contend that the ALJ's decision was erroneous because (1) there was substantial evidence in the record that plaintiff met or was

54

medically equal to the Listings; (2) the ALJ's RFC determination
was not supported by substantial evidence because the ALJ vio-
lated the treating physician rule and (3) the ALJ should have
found plaintiff disabled because of her advanced age.

The Commissioner contends that the ALJ's decision was
supported by substantial evidence and should be affirmed (Memo-
randum of Law in Support of the Commissioner's Cross-Motion for
Judgment on the Pleadings and in Opposition to Plaintiff's Motion
for Judgment on the Pleadings, dated Aug. 21, 2018 (D.I. 19)
("Def. Memo.")).

As described above, the ALJ went through the sequential
process required by the regulations. The ALJ's analysis at steps
one and two were decided in plaintiff's favor, and the Commis-
sioner has not challenged those findings. I shall, therefore,
limit my discussion to addressing whether the ALJ's analysis at
steps three, four and five complied with the applicable legal
standards and was supported by substantial evidence.

1. Step 3: The Listings

At step three, the ALJ found that none of plaintiff's
impairments, either singularly or in combination, were severe
enough to meet or medically equal the impairments in the Listings
(Tr. 20, citing 20 C.F.R. Pt. 404, Subpt. P, App. 1). To show
that an impairment meets or is medically equal to a listing, a

claimant must show that his or her impairments "meet all of the specified criteria." Sullivan v. Zebley, 493 U.S. 521, 530 (1990); accord Solis v. Berryhill, 692 F. App'x 46, 48 (2d Cir. 2017); King v. Astrue, 32 F. Supp. 3d 210, 218 (N.D.N.Y. 2012). If a claimant's impairment "manifests only some of those criteria, no matter how severely," the impairment does not qualify. Sullivan v. Zebley, supra, 493 U.S. at 530; see also Scully v. Berryhill, 282 F. Supp. 3d 628, 636 (S.D.N.Y. 2017) (Gorenstein, M.J.). To satisfy this burden, a claimant must show abnormal physical findings that "must be determined on the basis of objective observation during the examination and not simply a report of the individual's allegation." 20 C.F.R. pt. 404, Subpt. P, App. 1, § 1.00(D).

Not only does plaintiff not explain how the medical evidence shows that she was medically equal to a listing, she does not even identify which of the listing determinations she is challenging; plaintiff merely states that "[i]t is contended that the claimant meets the Listing of Impairments 1.00" (Pl. Memo. at 12). However, directly underneath that sentence, plaintiff lists symptoms and diagnoses that all relate to her herniated discs at L4-L5 and L5-S1 (Pl. Memo. at 12). Thus, I understand plaintiff to be challenging the ALJ's determination that she did not meet Listing 1.04.

Listing 1.04 addresses disorders of the spine and

56

requires a showing of a "compromise of a nerve root . . . or the spinal cord" with one or more of the following:

> (A) Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> (B) Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> (C) Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively.

20 C.F.R. pt. 404, Subpt. P, App. 1, § 1.04.

The ALJ found that "[t]he medical evidence [did] not establish the requisite evidence of nerve root compression, spinal arachnoiditis or lumbar spinal stenosis as required under listing 1.04" (Tr. 21). Plaintiff contends that remand is required because her May 28, 2013 MRI showed evidence of herniated discs at L4-L5 and L5-S1, her EMG studies showed evidence of radiculopathy and she had positive straight-leg-raising tests, an antalgic gait and a limited range of motion in her lumbar spine (Pl. Memo. at 12).

There is not a single diagnosis or mention of spinal

arachnoiditis in the entire medical record and plaintiff's May
28, 2013 MRI specifically stated that there was "no significant
central spinal canal stenosis" (Tr. 426). Thus, it is clear that
plaintiff does not meet or medically equal Listing 1.04(B) or
(C). Whether plaintiff met all the criteria of Listing 1.04(A)
is a closer call.

Plaintiff is correct that her MRI revealed two herni-
ated discs and that she was diagnosed by multiple practitioners
with radiculopathy. However, while the ALJ may have been inaccu-
rate in his general statement that there was "no evidence of
nerve root compression" in the record, remand is unwarranted
because a review of the overall treatment period shows that there
is evidence that supports the finding that not all the criteria
listed in Section 1.04(A) were met and the ALJ's ruling is,
therefore, supported by substantial evidence. See King v.
Astrue, supra, 32 F. Supp. 3d at 219 (remand not required where
ALJ "erred in failing to explicitly reconcile [a] conflict in the
record" concerning Section 1.04(A) because even with this error,
there was substantial evidence to show plaintiff did not meet all
of the required criteria).

First, the only MRI of plaintiff's spine in the record
shows that, although plaintiff had a herniated disc at L4-L5 that
was encroaching the left neural foramen, the exiting nerve root
appeared intact (Tr. 425-26). Thus, substantial evidence exists

that plaintiff did not have nerve root compression required by Listing 1.04(A).

Second, there is conflicting evidence in the record as to whether all the aggravating factors required by Section 1.04(A) existed -- namely, motor loss accompanied by sensory or reflex loss. While Dr. Polifrone documented some examinations where plaintiff was experiencing sensory loss and motor loss, Dr. Krishnamurthy noted that plaintiff exhibited normal reflexes and full muscle strength on August 30, 2013, January 17, 2014, July 11, 2014, February 13, 2015, May 8, 2015, July 24, 2015, November 6, 2015 and March 4, 2016 (Tr. 380, 377, 709, 714, 721, 730, 737, 802). On April 21, 2014, plaintiff's neurological examination was normal, and Dr. Johnston noted that she exhibited full muscle strength with no atrophy (Tr. 534). Drier also found that plaintiff's sensations and reflexes were all normal with no signs of muscle atrophy during his examinations on July 21, 2015, October 20, 2015 and March 8, 2016 (Tr. 752, 700, 810).

Third, plaintiff's multiple positive straight-leg-raising tests are not determinative. While there were approximately 14 positive straight-leg-raising tests in the record, there were also approximately 19 negative straight-leg-raising tests (Tr. 266-67, 272-73, 277-78, 282, 288, 291, 294, 320, 322, 325, 330, 377, 380, 561, 573, 576, 581, 584, 587, 590, 596, 599, 605, 700, 709, 714, 721, 730, 737, 752, 776, 802, 810). More-

over, even if that were not the case, multiple positive straight-leg-tests, without more, do not meet all of the specified criteria required by Listing 1.04(A). Solis v. Berryhill, supra, 692 F. App'x at 48; see also King v. Astrue, supra, 32 F. Supp. 3d at 219-20 (evidence of nerve compression along with multiple instances of positive straight-leg-raising tests does not satisfy Section 1.04(A) if there is not sufficient evidence of motor loss accompanied by sensory loss or reflex loss).

Admittedly, there is some evidence that supports that plaintiff may have met or been medically equal to Listing 1.04(A). However, where, as here, there are conflicts in medical evidence, "it is the ALJ's decision that controls as factfinder." King v. Astrue, supra, 32 F. Supp. 3d at 220, citing Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983). So long as the "Commissioner's decision rests on adequate findings supported by evidence having rational probative force [the court must] not substitute [its] judgment for that of the Commissioner." Veino v. Barnhart, 312 F.3d 578 (2d Cir. 2002). Furthermore, the Second Circuit has explicitly held that "[w]here there is substantial evidence to support either [the claimant's or the ALJ's position], the determination is one to be made by the factfinder." Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990); accord Scully v. Berryhill, supra 282 F. Supp. 3d at 636 (ALJ's decision upheld where medical evidence could support

either finding that claimant did or did not have nerve root compression); Knight v. Astrue, supra, 32 F. Supp. 3d at 219-20 (ALJ's decision upheld even though there were intermittent test results indicating some motor loss because the majority of physical examinations showed normal motor skills); Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (Gorenstein, M.J.) ("If the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists.").

Thus, plaintiff is not entitled to remand because substantial evidence supports the ALJ's determination that plaintiff did not have an impairment or combination of impairments under Section 1.04(A).

### 2. Step 4: the ALJ's RFC Determination

The ALJ found that plaintiff had the RFC to perform light work and was limited to only occasionally stooping, reaching overhead, pushing and pulling (Tr. 22). The ALJ also acknowledged plaintiff's psychological nonexertional limitations and stated that, notwithstanding these limitations, she could understand, remember and carry out "simple work" (Tr. 22). The ALJ's RFC is supported by substantial evidence.

Dr. Krishnamurthy conducted a thorough physical examination of plaintiff on ten separate occasions. After nine out of ten of these examinations, Dr. Krishnamurthy opined that plaintiff was able to return to work with the restrictions of not lifting objects greater than 20 pounds and refraining from repetitive bending, pushing or pulling (Tr. 376-78, 708-38, 775-77, 801-03). Dr. Krishnamurthy based this opinion on plaintiff's overwhelmingly normal physical and neurological examinations, as well as, his review of her prior medical records, EMG studies and MRIs of her lumbar spine and right wrist (Tr. 376-78, 708-38, 775-77, 801-03).

Dr. Johnston and Drier reached similar conclusions. Dr. Johnston opined that plaintiff had moderate limitations on bending and lifting, and mild limitations on prolonged sitting and standing (Tr. 534-35). Drier opined on three separate dates that plaintiff could resume her usual work activities with the restrictions of not lifting objects over 25 pounds, no repetitive bending and no prolonged sitting (Tr. 701, 752, 810).

These assessments constitute substantial evidence supporting the ALJ's determination that plaintiff was capable of performing "light work." See 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying objects weighing up to 10 pounds."). The ALJ also properly accounted for plaintiff's exertional

limitations of only occasionally stooping, reaching overheard, pushing and pulling, and for plaintiff's nonexertional limitations of being limited to simple work based on her psychological symptoms (Tr. 22).

### a. Treating Physician Rule

Plaintiff's only substantial challenge to the ALJ's RFC determination is that the ALJ violated the treating physician rule by not crediting the opinions of Drs. Polifrone and Koretsky (Pl. Memo. at 11-17).

In considering the evidence in the record, the ALJ must afford deference to the opinions of a claimant's treating physicians. A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in . . . [the] record." 20 C.F.R. § 404.1527(c)(2);[26] see also Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000); Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

"[G]ood reasons" must be given for declining to afford a treating physician's opinion controlling weight. 20 C.F.R. §

---

[26]The SSA recently adopted regulations that alter the standards applicable to the review of medical opinion evidence with respect to claims filed on or after March 27, 2017. See 20 C.F.R. § 404.1520c. Because plaintiff's claim was filed before that date, those regulations do not apply here.

404.1527(c)(2); Schisler v. Sullivan, supra, 3 F.3d at 568;

Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 n.3

(S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).  The Second Circuit has

noted that it "'do[es] not hesitate to remand when the Commis-

sioner has not provided "good reasons" for the weight given to a

treating physician['s] opinion.'"  Morgan v. Colvin, 592 F. App'x

49, 50 (2d Cir. 2015) (summary order), quoting Halloran v.

Barnhart, 362 F.3d 28, 33 (2d Cir. 2004); accord Greek v. Colvin,

802 F.3d 370, 375 (2d Cir. 2015).

As long as the ALJ provides "good reasons" for the

weight accorded to the treating physician's opinion and the ALJ's

reasoning is supported by substantial evidence, remand is unwar-

ranted.  See Halloran v. Barnhart, supra, 362 F.3d at 32-33; see

also Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013);

Petrie v. Astrue, 412 F. App'x 401, 406-07 (2d Cir. 2011) (sum-

mary order); Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir.

2009) (summary order).  "The opinions of examining physicians are

not controlling if they are contradicted by substantial evidence,

be that conflicting medical evidence or other evidence in the

record."  Krull v. Colvin, 669 F. App'x 31, 32 (2d Cir. 2016)

(summary order) (citation omitted); see also Monroe v. Comm'r of

Soc. Sec., 676 F. App'x 5, 7 (2d Cir. 2017) (summary order).  The

ALJ is responsible for determining whether a claimant is "dis-

abled" under the Act and need not credit a treating physician's

determination on this issue if it is contradicted by the medical record.  See Wells v. Comm'r of Soc. Sec., 338 F. App'x 64, 66 (2d Cir. 2009) (summary order).

The ALJ may rely on the opinion of a consultative physician where it is supported by substantial evidence in the record.  See Richardson v. Perales, supra, 402 U.S. at 410; Camille v. Colvin, 652 F. App'x 25, 27-28 (2d Cir. 2016) (summary order); Diaz v. Shalala, supra, 59 F.3d at 313 n.5; Mongeur v. Heckler, supra, 722 F.2d at 1039; see also Shrack v. Berryhill, 3:16 CV 2064 (RMS), 2018 WL 2926564 at *10 (D. Conn. June 7, 2018) ("The Second Circuit has recognized . . . the opinions of non-examining sources may 'override treating sources' opinions, provided they are supported by evidence in the record." quoting Schisler v. Sullivan, supra, 3 F.3d 563 at 1993).

The ALJ assigned "no weight" to Dr. Polifrone opinions that plaintiff was "100% disabled" because (1) workers' compensation standards are different than disability standards under the Act, (2) Dr. Polifrone never discussed specifically what plaintiff's limitations were and how she reached her conclusion that plaintiff was 100% disabled and (3) Dr. Polifrone's opinions were inconsistent with the opinions of Drs. Krishnamurthy and Dr. Johnston (Tr. 25).

Turning to the ALJ's first reason for rejecting Dr. Polifrone's opinion, it is well settled that an opinion provided

65

in connection with a workers' compensation claim is not control-
ling with respect to a claim of disability claim under the Act.
See Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("A treating
physician's statement that the claimant is disabled cannot itself
be determinative."); see also Mangum v. Colvin, 13 Civ. 4213
(KPF), 2015 WL 629403 at *11 n.13 (S.D.N.Y. Feb. 13, 2015)
(Failla, D.J.) ("[T]he characterization of Plaintiff as 'dis-
abled' by medical providers for purposes of his Workers' Compen-
sation claim is not particularly useful in the Social Security
context because the two statutory schemes have completely differ-
ent definitions of disability."); Simmons v. Colvin, 13 Civ. 1724
(KBF), 2014 WL 104811 at *7 n.5 (S.D.N.Y. Jan. 8, 2014) (Forrest,
D.J.) ("'[T]he standards which regulate workers' compensation
relief are different from the requirements which govern the award
of disability insurance benefits under the Act,' and 'an opinion
rendered for purposes of workers' compensation is not binding on
the [Commissioner].'" (citation omitted)); DeJesus v. Chater, 899
F. Supp. 1171, 1177 (S.D.N.Y. 1995) (Koeltl, D.J.) ("The issue is
whether a person is disabled as that term is defined under the
Social Security Act, not whether a person is 'disabled' or
'partially disabled' for purposes of workers' compensation."). 
Thus, the ALJ provided a "good reason" for not giving controlling
weight to Dr. Polifrone's opinion that plaintiff was "100%
disabled."

66

Second, the ALJ is correct that Dr. Polifrone never assessed plaintiff's specific functional limitations and did not provide any explanation for her conclusion that plaintiff was 100% disabled. Dr. Polifrone filled out workers' compensation assessment forms separately from her treatment notes and simply marked "100% disabled" without any detail supporting or explaining this assertion.

Third, Dr. Polifrone's findings appear to be inconsistent with the overall record, including the examinations and opinions of Drs. Krishnamurthy and Johnston. Although plaintiff visited Dr. Krishnamurthy for "independent orthopedic evaluations," plaintiff saw Dr. Krishnamurthy ten times throughout the relevant period. Thus, it is arguable that Dr. Krishnamurthy also qualifies as a treating physician. See 20 C.F.R. § 404.1527(a)(2) (a treating physician is one who the claimant has seen "with a frequency consistent with medical practice for the type of treatment . . . required for [claimant's] medical condition" to establish an "ongoing treatment relationship" with the claimant); see also Nunez v. Berryhill, 16 Civ. 5078 (HBP), 2017 WL 3495213 at *23 (S.D.N.Y. Aug. 11, 2017) (Pitman, M.J.) (physician who met with plaintiff three times over the course of three months considered a treating physician); Vasquez v. Colvin, 14 Civ. 7194 (JLC), 2015 WL 4399685 at *20 (S.D.N.Y. July 20, 2015) (Cott, M.J.) (physician who met with

plaintiff four times considered a treating physician); <u>Harrison</u>
<u>v. Sec'y of Health & Human Servs.</u>, 901 F. Supp. 749, 755
(S.D.N.Y. 1995) (Schwartz, D.J.) (same). Furthermore, unlike Dr.
Polifrone, Dr. Krishnamurthy is an orthopedic surgeon who pro-
vided highly detailed examination notes and assessed plaintiff's
functional limitations after each examination. Thus, the ALJ did
not violate the treating physician by giving deference to Dr.
Krishnamurthy's opinions over Dr. Polifrone's opinions.[27]

Plaintiff appears to argue that the ALJ erred in
affording "significant weight" to Dr. Johnston's opinion because
Dr. Johnston did not review plaintiff's lumbar spine MRI or EMG
studies before making his assessment (Pl. Memo. at 11).[28]
Plaintiff's argument is meritless.

While it is unclear what, if any, prior medical records
Dr. Johnston reviewed prior to his consultative examination of
plaintiff, Dr. Johnston based his opinions on his physical
examination, which revealed no neurological abnormalities, no
muscle weakness or atrophy, normal reflexes, slightly limited
range of motion in plaintiff's lumbar spine and full range of
motion in all other extremities (Tr. 532-35). Dr. Johnston's

---

[27]Plaintiff does not appear to take any issue with the ALJ
crediting Dr. Krishnamurthy's opinion.

[28]Oddly, plaintiff first states that the ALJ improperly
"disregarded" Dr. Johnston's examination and then goes on to
criticize the ALJ for affording significant weight to his
findings (Pl. Memo. at 11).

opinion that plaintiff had a moderate limitation with bending and
lifting, and a mild limitation with prolonged sitting or standing
is consistent with the overall record.  Furthermore, the Second
Circuit has explicitly held that an ALJ is not precluded from
assigning "great weight" to a consultative physician's opinion
who did not review a plaintiff's prior MRI so long as the
physician "personally examined the plaintiff and reached
conclusions consistent with the objective medical evidence."
Wright v. Berryhill, 687 F. App'x 45, 48 (2d Cir. 2017) (summary
order).

Thus, the ALJ also did not violate the treating physi-
cian by giving deference to Dr. Johnston's opinions over Dr.
Polifrone's opinions.

Turning to plaintiff's psychological records, the ALJ
afforded "little weight" to Dr. Koretsky's opinion that plaintiff
had a disability due to her mental health symptoms that was
independent from her physical symptoms because Dr. Koretsky's
treatment notes were cursory and did not include any clear
functional limitations, and Dr. Koretsky's opinion was inconsis-
tent with the opinions of Drs. Citrome and Antiaris (Tr. 24-
25).[29]

---

[29]The ALJ also found that Dr. Koretsky's opinion was
inconsistent with plaintiff's activities of daily living.  It is
somewhat unclear what the ALJ meant by this because, overall,
plaintiff's description of her daily activities could support a
(continued...)

The ALJ is correct that Dr. Koretsky's treatment notes
from his biweekly sessions with plaintiff are extremely cursory
and show that plaintiff mainly discussed stressors relating to
her physical injury (Tr. 384-86, 396-97, 634-83).  Even in Dr.
Koretsky's three narrative reports, his evaluations are solely
based on plaintiff's self-reported symptoms and he does not
provide any assessments of plaintiff's functional limitations,
such as her ability to socially function, maintain concentration,
relate adequately with others or understand simple instructions
(Tr. 307-12, 637, 662-63).

The ALJ is also correct that Dr. Koretsky's opinions
appear to be inconsistent with the opinions of Drs. Antiaris and
Citrome.  Dr. Antiaris noted that plaintiff was oriented and
cooperative during her evaluation, that plaintiff's attention and
concentration were intact, that plaintiff was able to complete
simple calculations and that plaintiff was capable of remembering
items (Tr. 530).  Unlike Dr. Koretsky, Dr. Antiaris assessed

[29] (...continued)
finding of a mental disability considering she stated that she
needs assistance with daily chores, has no hobbies, stays home
all day and does not have any interest in doing anything.
However, as the ALJ correctly pointed out later in his decision,
plaintiff's description of her daily activities is not credible.
Plaintiff reported that she drives herself to her doctors'
appointments approximately four times per week and has taken
multiple vacations to Florida, the Dominican Republic and Puerto
Rico during the same time period that she was allegedly unable to
leave the house and had "no interest in doing anything
whatsoever" because she was depressed about her condition (Tr.
63-66, 84, 229).

plaintiff's cognitive functioning and opined that plaintiff had no limitations with following and understanding simple directions; performing simple or complex tasks independently; maintaining attention, concentration and a regular schedule; learning new tasks; making appropriate decisions and relating to others (Tr. 530). Dr. Antiaris further opined that plaintiff had moderate limitations in her ability to handle stress, but that plaintiff's symptoms were not significant enough to interfere with plaintiff's ability to function on a daily basis (Tr. 530-31).

Dr. Citrome similarly found that plaintiff was cooperative, oriented and exhibited a normal and logical thought process throughout her two evaluations (Tr. 745-46, 826). However, due to plaintiff's depressed mood, Dr. Citrome opined that plaintiff had a moderate, temporary, partial disability with respect to her psychological symptoms (Tr. 746, 827).

Thus, the ALJ also did not violate the treating physician by giving less than controlling weight to Dr. Koretsky's opinion.

### 3. Step 5: Advanced Age

Finally, plaintiff maintains that remand is required because the ALJ improperly assessed plaintiff's age at step five (Pl. Memo. at 10).

At step five, "an ALJ must consider [the claimant's] chronological age in combination with her [RFC], education, and work experience" in determining whether she can engage in any other substantial gainful work which exists in the national economy. Polyak v. Berryhill, 17-CV-0215 (HBF), 2018 WL 6418298 at *4 (W.D.N.Y. Dec. 6, 2018) (internal quotation marks and citation omitted); accord Gray v. Chater, supra, 903 F. Supp. at 298. "The Grids provide for three distinct age categories: (1) 'younger person' is an individual between the ages 18 and 49; (2) 'person closely approaching advanced age' is an individual between the ages 50 and 54; and, (3) 'person of advanced age' is an individual 55 and over." Torres v. Comm'r of Soc. Sec., 14-CV-6438, 2015 WL 5444888 at *9 (W.D.N.Y. Sept. 15, 2015), citing 20 C.F.R. §§ 404.1563(c)-(e). If a claimant is "closely ap-proaching advanced age, [the Commissioner] will consider that [her] age, along with a severe impairment and limited work experience, may seriously affect [her] ability to adjust to other work" in the national economy." 20 C.F.R. § 404.1563(c). "However, a claimant's acquisition of skills transferable to other work gives [her] a special advantage over unskilled workers in the labor market." Brown v. Colvin, 146 F. Supp. 3d 489, 493 (W.D.N.Y. 2015) (internal quotation marks and citations omitted). Thus, in order for an ALJ to find a claimant who is closely approaching advanced age "not disabled", [he] must also find that

the claimant acquired skills in [her] past work that are trans-
ferable to other skilled or semi-skilled jobs." Brown v. Colvin,
supra, 146 F. Supp. 3d at 493.

Plaintiff incorrectly asserts that the ALJ "overlooked"
that plaintiff was a person "approaching advanced age" (Pl. Memo.
at 10); the ALJ expressly acknowledged plaintiff's age and
considered her high school education and her 30 years of "skilled
work" experience as a bank deposit manager when determining
whether plaintiff had the requisite skills that were transferable
to other jobs (Tr. 29). Admittedly, the ALJ could have been more
thorough and specific in his assessment; however, he clearly
included plaintiff's age, education and work experience in his
hypothetical to the VE (Tr. 87). There is substantial evidence
that plaintiff is not an individual approaching advanced age who
has limited work experience that might affect her ability to
adjust to other work. On the contrary, plaintiff has a high
school degree, is able to communicate in English and has 30 years
of experience in a skilled position. Thus, the ALJ properly
considered that plaintiff was a individual of closely approaching
advanced age.

Plaintiff next argues that because she was on the
borderline of being considered a "person of advanced age," the
ALJ erred in not rendering her disabled (Pl. Memo. at 10).

"If a claimant's age is 'borderline' and the ALJ fails

73

to consider whether the higher age category should be used, remand is warranted so long as a higher age category would entitle the claimant to benefits." Woods v. Colvin, 218 F. Supp. 3d 204, 209 (W.D.N.Y. 2016). "Although the regulations do not clearly define the outer limits of a borderline age situation," courts within this Circuit have generally considered a case to be "borderline" if a claimant is within a few months of entering the higher age category. See Polyak v. Berryhill, supra, 2018 WL 6418298 at *5 (borderline where claimant was within four months of higher age category); Waldvogel v. Comm'r of Soc. Sec., 16-CV-0868 (GTS), 2017 WL 3995590 at *12 (N.D.N.Y. Sept. 11, 2017) (borderline where claimant was within two months of higher age category); Sourliere v. Colvin, 13-cv-236 (JMC), 2015 WL 93827 at *5 (D. Vt. Jan. 7, 2015) (borderline where claimant was within six months of higher age category).

If an ALJ finds that a borderline situation exists, he then "must decide whether it is more appropriate to use the higher age or the claimant's chronological age." Torres v. Comm'r of Soc. Sec., supra, 2015 WL 5444888 at *9, citing Social Security Administration's Hearings, Appeals and Litigation Law Manual ("HALLEX") at II-5-3-2. "When making this determination, the [ALJ] is instructed to consider the presence of additional adversities . . . which require[] a greater showing of adversity" that the claimant faces in adjusting to other work. Torres v.

Comm'r of Soc. Sec., supra, 2015 WL 5444888 at *9. While the ALJ

is mandated to make this borderline assessment, the ultimate

determination on whether a claimant's borderline age or

chronological should apply is within the ALJ's discretion.

Torres v. Comm'r of Soc. Sec., supra, 2015 WL 5444888 at *9;

accord Woods v. Colvin, supra, 218 F. Supp 3d at 209; Jerome v.

Astrue, 08-CV-98, 2009 WL 3757012 at *14 (D. Vt. Nov. 6, 2009).

The Commissioner concedes that plaintiff qualified as a

"borderline" person of advanced age considering she was one month

away from turning 55 years old at the time of the ALJ's

decision.[30] The ALJ also noted plaintiff's borderline age in his

decision and conceded that the higher age category of "advanced

age" would have resulted "in a decision of disabled" (Tr. 29).

However, the ALJ ruled that it was appropriate to use plaintiff's

chronological age of 54 years old rather than a borderline age of

---

[30]I note that there is some authority that holds that in a
claim solely for DIB, a claimant's age must be assessed from the
date of last insured, rather than the date of the ALJ's decision.
See Polyak v. Berryhill, supra, 2018 WL 6418298 at *5; Koszuta v.
Colvin, 14-CV-694(JTC), 2016 WL 824445 at *2 (W.D.N.Y. Mar. 3,
2016); Grace v. Astrue, 11 Civ. 9162 (ALC)(MHD), 2013 WL 4010271
at *24 (S.D.N.Y. July 31, 2013) (Carter, D.J.). However, SSR 83-
10 makes clear that this only applies to situations where the
claimant "last met the insured status requirement before the date
of the [ALJ's] adjudication." SSR 83-10. Because the ALJ issued
his decision on June 29, 2016 and plaintiff's date of last
insured was December 31, 2017, plaintiff's age should be assessed
at the time of the ALJ's decision. Moreover, the ALJ, the
Commissioner and plaintiff all appear to agree that plaintiff's
age should be assessed from June 26, 2016, making her 54 years
and 11 months old (Tr. 29; Def. Memo. at 25; Pl. Memo. at 10).

55 years old because plaintiff was a high school graduate with "good work experience", and, otherwise, did not present with additional adversities to warrant a higher age category (Tr. 29). As supported by the record, plaintiff was not an unskilled worker who had any language, communication or educational barriers that would prevent her from adjusting to other work as is typical in most other "borderline cases." While it is certainly reasonable for plaintiff to argue that the ALJ should have considered her to be a person of advanced age since she was only 20 days from turning 55 years old and she had mental health impairments that limited her to simple work, as stated above, this determination is within the discretion of the ALJ, and I cannot substitute my own judgment for that of the ALJ. See Woods v. Colvin, supra, 218 F. Supp. 3d at 209 ("It is important to note that the ALJ is not necessarily required to use the higher age category in a borderline situation. Rather, the ALJ's error . . . [will come] from the fact that he did not even consider whether using the higher age category would be appropriate." (emphasis in the original)); Torres v. Comm'r of Soc. Sec., supra, 2015 WL 5444888 at *9 (the ALJ should "exercis[e] discretion" when making a borderline case determination); Jerome v. Astrue, supra, 2009 WL 3757012 at *14 ("Borderline situations are considered in light of evaluating the overall impact of all the factors of [a] claim-ant's case. Factual findings and considerations are within the

sound discretion of the ALJ, and th[e] Court will defer to such findings." (internal quotation marks and citation omitted)).

Because the ALJ considered plaintiff's borderline age in his decision, remand is unwarranted.

IV.  Conclusion

Accordingly, for all the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted and plaintiff's motion is denied.  The Clerk of the Court is respectfully requested to mark D.I. 16 and D.I. 18 closed, and respectfully requested to close the case.

Dated:  New York, New York
        March 19, 2019

                              SO ORDERED


                              HENRY PITMAN
                              United States Magistrate Judge

Copies transmitted to

All Counsel